```
UNITED STATES DISTRICT COURT                    FOR PUBLICATION
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA            :
                                    :
        -against-                   :           MEMORANDUM  DECISION
                                    :
DAYANA MENDOZA and                  :           09-CR-292 (JG)
JINNATE JONES,                      :
                                    :
                Defendants.         :
-------------------------------------------------------x
```

A P P E A R A N C E S:

    BENTON J. CAMPBELL
        United States Attorney for the Eastern District of New York
        271 Cadman Plaza East
        New York, New York 11201
  By:   Zainab Ahmad
        Allon Lifshitz
        Winston Paes
        *Attorney for the United States*

    J. PATTEN BROWN, III
        110 Wall Street
        New York, New York 10005
        *Attorney for Defendant Mendoza*

    MARION A. SELTZER
        1725 York Avenue
        New York, New York 10128
        *Attorney for Defendant Jones*


JOHN GLEESON, United States District Judge:

        This case illustrates the need for legislation that clearly authorizes payment for housing and subsistence for indigent out-of-town defendants during federal criminal trials.

Dayana Mendoza and Jinnate Jones live in California, and they were charged with a federal crime in an indictment filed here in Brooklyn. Neither was a danger to the community or a flight risk, so they were released on bail. They had insufficient means to afford legal representation, so each was provided with a court-appointed lawyer. As their trial neared, they sought funds so that they could stay somewhere in the New York area for the two weeks that the prosecutors estimated the trial was going to last. As far as I was concerned, the only question was who should pay for their lodging. After considering various options and submissions from interested parties, I concluded that the only real option I had was to authorize payment from Criminal Justice Act ("CJA") funds, whose purpose is to provide legal representation for indigent defendants. I chose this source of funds reluctantly. I write to explain my reasons for the decision and for my reluctance.

Mendoza is a single mother who lives in the Bay Area with her infant daughter. Jones also lives near San Francisco, and has a young son. They came to the attention of the United States Attorney in the district because of their involvement with a fraudulent enterprise named Apogee Financial. Apogee purported to sell to its clients "Proof of Funds" letters indicating that the clients held money in accounts with well-known banks. In fact, the letters were fakes and the accounts did not exist. Apogee's headquarters were in an office building in Detroit. To bolster the fraud, Apogee employed "gatekeepers" to recruit people who worked in banks in New York and California. The role of the bank employees – of whom Mendoza and Jones were two – was to accept phone calls and say that the fake letters on their employers' letterheads were real. Mendoza worked at a Wells Fargo branch in Emeryville, California and received $23,000 for her role in the fraud. Jones, who got $6,000, worked at a Wells Fargo branch in Pittsburg, California.

Mendoza and Jones were charged with conspiracy to commit wire fraud in a nine-defendant superseding indictment.[1] Their co-defendants were Aisha Hall (from Detroit), the CEO of Apogee; Yolande Reeves (Detroit), Hall's assistant; Jerjuan Gardner (Detroit) and Marcel Asbell (Detroit), members of the sales force; Jack Horbulewicz (Chicago), Apogee's in-house forger; and two "gatekeepers," Walter Brown (California) and Quiana Ganter (California). None of the nine defendants was from the Eastern District of New York, but the indictment alleged that acts in furtherance of the conspiracy took place in this district, thereby providing a sufficient basis for venue here.[2]

By the time they were indicted, Mendoza and Jones had lost their jobs at Wells Fargo. Given their financial situations, they were appointed counsel under the CJA. They were released on unsecured bonds and for the most part stayed in California during the pre-trial phase of the case. Mendoza, who received no child support from her child's father, was in particularly difficult financial straits. She appeared by telephone to be arraigned on the superseding indictment, but I required her presence at a status conference on September 8, 2009. Because Mendoza could not afford a cross-country plane ticket, I ordered the United States Marshals Service to arrange for her to travel to Brooklyn pursuant to 18 U.S.C. § 4285. I did the same to enable her presence at oral argument on her pre-trial motions on January 29, 2010.

Before the trial, Mendoza requested a change of venue to the Eastern District of California, where all the acts she was accused of took place. I denied the motion. The conspiracy with which Mendoza was charged included activities in various parts of the country,

---

[1] Jones was also charged with a substantive wire fraud count.

[2] In addition to the nine defendants under the 09-CR-292 docket number, the government also brought charges in this district against other conspirators, some of whom testified as cooperating witnesses at Mendoza's and Jones's trial. One of these, Edward Gordon, was a bank employee from New York.

including the Eastern District of New York, and the government was entitled to bring the case against Mendoza and her co-defendants here. All the same, the roster of defendants to be tried experienced the usual attrition, and by the time of trial, what was left to be tried had only a tenuous connection to New York. Specifically, of the nine defendants who were initially indicted, seven pled guilty; only Mendoza and Jones exercised their right to a trial.

Two weeks prior to the trial, Mendoza's counsel sought an order requiring the United States Marshals Service to arrange lodging and subsistence for Mendoza during the trial. At the time, this seemed like an obviously meritorious request. Mendoza is required by Federal Rule of Criminal Procedure 43(a) to be present "at every trial stage." It would be unseemly for our criminal justice system to haul a defendant across the country and require her to live on the street during her criminal trial. But finding an acceptable way to provide a roof over Mendoza's head proved surprisingly difficult.

The United States Marshals Service is the most logical arm of the government to bear the responsibility. The Marshal transports indigent out-of-town defendants to court, and is already obligated to pay for lodging and subsistence for out-of-town witnesses. *See* 28 U.S.C. § 1821. The Marshals Service, however, denied any legal responsibility to provide Mendoza lodging and subsistence during the trial. When pressed, the Marshal made the only offer he could: a bed in the Metropolitan Detention Center, a suggestion that was unacceptable on its face. I would not remand an indigent defendant who is compliant with her bail conditions simply because of her inability to pay for her own lodging.

As a matter of statutory interpretation, the Marshal's view of his responsibilities is unfortunately the only reasonable one. 18 U.S.C. § 4285 provides that when an indigent defendant is released pending a court appearance, a judge "may, when the interests of justice

would be served thereby" direct the Marshal to arrange for or pay for transportation "to the place where his appearance is required" and "furnish [defendant] with an amount of money for subsistence expenses to [her] destination, not to exceed the amount authorized as a per diem allowance for travel under section 5702(a) of title 5, United States Code." One defect in the statutory language is that it authorizes only an order directing the Marshal to transport defendants *to* court. To its credit, the Marshals Service often requests (and complies with) court orders requiring it to arrange to send defendants back to their homes after a court appearance, even though the language of § 4285 does not require it to do so. Another statutory defect is the absence of judicial authority to require payment for lodging or food during a trial. Though the phrase "subsistence expenses to [her] destination" is somewhat opaque, the legislative history of § 4285 makes clear that it only authorizes the payment of subsistence expenses "for the time during which the defendant is actually travelling." *See* H.R.Rep. No. 95-1653, 95th Cong., 2d Sess. at 3 (1978) ("Subsistence shall terminate upon arrival at the defendant's destination and shall not continue throughout the defendant's stay at that destination."). The courts that have considered this question have agreed with the Marshals Service's interpretation of the statute.[3]

But if the Marshals Service does not have to provide Mendoza with lodging, who does? Pretrial Services, under whose supervision Mendoza was placed when she was released on bail, is another contender. The Pretrial Services Act defines "[p]retrial services functions" to include:

> Operate or contract for the operation of appropriate facilities for the custody or care of persons released under this chapter including residential halfway houses

---

[3] *See, e.g., United States v. Gundersen*, 978 F.2d 580, 584 (10th Cir. 1992) (holding that § 4285 "does not authorize payment of subsistence during the period of trial" and that it "authorizes payment only for the travel to court and subsistence during the period of travel"); *United States v. Sandoval*, 812 F. Supp. 1156 (D. Kan. 1993) (same). One court has gone so far as to suggest that I could be prosecuted under the Anti-Deficiency Act if I were to order payment for lodging under § 4285. *See United States v. Nave*, 733 F. Supp. 1002, 1003 (D. Md. 1990) (noting that this situation "might mildly amuse some" but "ought to be avoided, if possible").

5

> . . . and contract with any appropriate public or private agency or person, or expend funds, to monitor and provide treatment as well as nontreatment services to any such persons released in the community, including equipment and emergency housing . . . and other services reasonably deemed necessary to protect the public and *ensure that such persons appear in court as required.*

18 U.S.C. § 3154(4) (emphasis added).

The government contended that this language requires Pretrial Services to provide Mendoza with food and shelter. Some courts have accepted this argument. Candidly straining the language of the statute to avoid what it considered a serious constitutional difficulty, the Tenth Circuit held that "[a] reasonable construction of [the Pretrial Services Act] . . . is that the [A]ct requires the Agency to provide food and shelter for persons in defendants' position who can establish genuine need." *Gundersen*, 978 F.2d at 584. The Court acknowledged that the housing provided by Pretrial would be in a halfway house or an addiction treatment facility, where the defendant's liberties would be strictly controlled. "Nothing in the Constitution," the court wrote, "prevents the government from exercising cost control or requires that monies be handed to indigents to allow them to obtain food and housing of their own choice." *Id.* at 585. The choice then, "is not 'custody' versus freedom but rather a choice between fending for themselves (and foregoing any claim for food and housing) and accepting housing in available government facilities with such restrictions as are necessary for institutional purposes." *Id.*

Though I sympathize with the Tenth Circuit's effort to find a solution to this problem, placing the responsibility on Pretrial Services requires an overbroad reading of the statute defining its functions. The language in 18 U.S.C. § 3154(4) upon which the government relies – "other services reasonably necessary to … ensure that [Mendoza] appear[s] in court as required" – appears at the end of a long list of functions concerning the pretrial supervision of released defendants to which this purported function is unconnected. The government's view runs counter to two well-established canons of statutory interpretation: *ejusdem generis*, that "a

6

general term should be understood in light of the specific terms that surround it," *Hughey v. United States*, 495 U.S. 411, 419 (1990); and *noscitur a sociis*, which "counsels that a word is given a more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 295 (2008). In addition, the government's argument proves too much. If the obligation to "ensure" that defendant "appear in court" is read broadly enough to require Pretrial Services to house the defendant during trial, it would seem to require the agency to transport the defendant to court as well, a construction that would render 18 U.S.C. § 4285 superfluous.

Even aside from the statutory language, I cannot accept that "the indigent defendant must either rely, for food and shelter, upon the kindness of friends or strangers, or make arrangements through the Pre-Trial Services Agency for lodging in some appropriate facility, such as a half-way house." *Nave*, 733 F.Supp. at 1002. Although a less odious solution than jail, I do not see a halfway house as appropriate lodging for a defendant released on bail pending trial. Neither does Pretrial Services, which, upon my request, commented on the government's view. According to the Chief Pretrial Services Officer for this district, "halfway houses are not widely used as an alternative to detention for defendants released on pre-trial supervision." Memorandum from Cynthia Lawyer dated February 19, 2010, at 1. Because such facilities, which have strict rules, serve as "transitional facilities" primarily for offenders "who are in the process of reentering the community," and because the "admittance process can be complex, and oftentimes lengthy … [Mendoza] would not be an appropriate candidate to be admitted into a halfway house for the sole purpose of providing temporary housing." Moreover, forcing a defendant to submit to restrictions on her liberty, either in a halfway house or in jail, as

7

a condition of asserting her constitutional right to a trial would be a serious and in my view unacceptable burden on that right.

Another possible option is to require the government to pay for the out-of-town defendant's lodging as a matter of due process. Then-District Judge Pierre Leval did just that in the "Pizza Connection" case. *See United States v. Badalamenti*, No. 84 Cr. 236 (PNL), 1986 WL 8309 (S.D.N.Y. Jul. 22, 1986). Judge Leval agreed that the Marshals Service could not be required to pay under § 4285, but reasoned that "it is not consistent with fundamental fairness or due process that an accused defendant, regardless of the crime, be driven to ruin by the expense of attending trial at a place far from his home, nor that he be required to take refuge in jail because of an inability to meet the expense of attending trial." *Id.* at *2. Therefore, he ordered that "the Government is obligated to provide either decent, non-custodial lodging or the cost of obtaining it." *Id.* I agree that, under circumstances like those in the Pizza Connection trial, which lasted a year and a half, fundamental fairness dictates that the government should pay for the defendants' lodging in the absence of any other source. But the Mendoza/Jones trial was scheduled to last less than two weeks. Though I considered it objectionable and inefficient, I did not think that placing the defendants in jail or in a halfway house during the trial would have violated the Constitution.

The last potential source of funding, and the one in which I ultimately took refuge in this case, is the Criminal Justice Act, 18 U.S.C. § 3006A. The CJA requires each district court to operate "a plan for furnishing representation for any person financially unable to obtain adequate representation." *Id.* Section 3006A(e)(1) allows counsel to be reimbursed for expert, investigative, or "other services necessary for an adequate representation." Construed broadly, the term "other services" might be read to include lodging for a defendant during trial. Payment

8

for lodging for a defendant who would otherwise be homeless could be said to be necessary "for an adequate representation"; a defendant who sleeps on the streets is not going to be fit for a trial the next morning.[4]

Though this interpretation of the CJA's language is admittedly tortured,[5] I concluded that the only acceptable option in this case was to make use of the judiciary's budget for criminal defense attorneys. In the end, I asked the defense attorneys to book their clients into a modestly-priced hotel for the duration of the trial, and to pay the hotel bills with their credit cards. I instructed the lawyers that they would be reimbursed from CJA funds. Mendoza and Jones stayed in a hotel in Brooklyn a subway ride away from the courthouse for the trial's duration.[6]

It makes little sense to deputize defense counsel to carry this burden when the Marshals Service is otherwise responsible for ensuring the defendant's presence in this court. It is obviously inefficient for the defendant's lawyer to select a place to stay and negotiate the rate when the Marshals Service, which can bring economies of scale to bear on the matter, could do so. And defense counsel – many of whom are solo practitioners – should not be burdened with the up-front cost of providing an indigent defendant with temporary accommodation.

The lack of any judicial authority to require the Marshals to pay for lodging and subsistence in these circumstances is lamentable, and I am not the first to say so. As early as 1993, the Prado Committee noted the lack of any provision for subsistence expenses, or even for

---

[4] Anecdotally, the Federal Defenders have, out of their own budget, paid for lodging for defendants or put defendants up in the YMCA during trial, likely for this very reason. *See also United States v. Kahale*, No. 09-cr-159 (KAM) (E.D.N.Y. Jan. 15, 2010) (approving disbursement of funds under § 3006A to provide accommodation for indigent defendants).

[5] Notably, it is difficult to square with the canons of interpretation discussed above: *ejusdem generis* and *noscitur a sociis*.

[6] The trial of Mendoza and Jones began on February 16, 2010; eight days later, the jury returned guilty verdicts. I have since sentenced Mendoza to three years' probation. Jones awaits sentencing.

return travel.  *See* Report of the Committee to Review the Criminal Justice Act of 1964, Recommendation D-2.  The Committee quoted one defense attorney who stated that "[i]ndigent defendants arrested, transported thousands of miles from their home, and required to remain at the site of court at their own expense . . . must necessarily be under extreme pressure to give up their legal right to fully contest the case and instead plead 'guilty' out of hopelessness or frustration."  *Id.*  Based on the Prado Committee's recommendation, the Judicial Conference reported to Congress that "[t]he present lack of clear statutory authority to pay for [return] travel and subsistence . . . has resulted in substantial hardships to certain defendants."  Report of the Judicial Conference of the United States on Federal Defender Program, March 1993, at 35.  The Judicial Conference recommended that 18 U.S.C. § 4285 "be amended to give the presiding judge discretion in appropriate circumstances to order that funds be provided to CJA eligble person for travel to and from court proceedings and related consultations and for subsistence during court and related proceedings."  *Id.*

More than seventeen years later, the gap remains unfilled, and until Congress fills it courts all over the country will be required to choose among the unsatisfactory solutions that were presented to me in this case.  It makes the most sense to use the expertise and administrative structure already in place in the Marshals Service to deal with out-of-town witnesses to also deal with out-of-town defendants who cannot afford lodging and subsistence.  I hasten to add that the specific provisions for each class of travelers need not be identical,[7] but it seems clear that vesting the responsibility to make arrangements for both in one agency would be most efficient.  In any event, whether through an amendment to 28 U.S.C. § 1821 or otherwise, I respectfully call upon Congress to enact a solution to the problem.

---

[7]  For example, I am not suggesting that the defendants be entitled to lodging and subsistence at the federal government's *per diem* rates, which would be unnecessarily high.

10

John Gleeson, U.S.D.J.

Dated: August 26, 2010
Brooklyn, New York